THOMAS W. MURPHY et al., Appellants, v. KNIGHTS OF COLUMBUS BUILDING COMPANY, Respondent.

St. Louis Court of Appeals, March 4, 1911.

1. **PRINCIPAL AND AGENT: Power of Agent: Express Authority.** The chairman of a committee, authorized by the board of directors of a corporation to "go out and find an available site" (for a building) and to "go out and ascertain different locations and submit them to the board," did not have express authority to hire a real estate agent to assist him.

2. ————: ————: **Implied Authority.** A delegation of power to an agent carries with it the power to do all things reasonably necessary and proper to carry into effect the main power conferred, and which are not forbidden; and to be necessary, in this sense, the act need not be so indispensable that without it the agent cannot move toward achieving the main object of the agency, or, having commenced to move, must stop, but it must have been requisite for such achievement, according to the desire and intention of the principal—necessary in the sense that the main scope and object of the agency must fail unless it is done.

3. ————: ————: ————: **Question for Jury.** Whether an act done by an agent possessing specified power is necessary, and therefore within the power conferred, is for the jury, under proper instructions, where the conclusion to be drawn from the facts is not obvious.

4. ————: ————: ————: ————. Whether the chairman of a real estate committee of a corporation, desirous of procuring real estate in a large city, employed to find available property and report, had authority to employ a real estate agent to assist him, *held*, under the evidence, for the jury.

**INTENT: Methods of Manifesting: Evidence.** Language is only one method of expressing intent, conduct sometimes being as significant as spoken or written words.

6. **PRINCIPAL AND AGENT: Power of Agent: Intent of Principal: Evidence.** Where a claim for compensation was made by one who asserted he had been employed by an agent of a corporation to procure a suitable building site, and conferences were had between the claimant and officers of the corporation concerning the claim, and the whole matter was in abeyance for almost a year, during which time the officers of the corporation

at no time suggested the agent lacked authority to employ the claimant, such failure to deny the agent's authority, standing unexplained, was significant evidence of the corporation's intent to invest him with it.

7. REAL ESTATE BROKERS: Compensation: Finding Suitable Property for Purchaser. Real estate agents are not confined to the business of finding purchasers for owners, but they may be engaged as agents to find suitable property for those who wish to purchase, in which case, in the absence of a stipulation to the contrary, the presumption is, they are to be compensated by the purchaser.

8. ———: ———: ———: Sufficiency of Evidence. In an action by a real estate broker for compensation in securing a building site, evidence *held* to show plaintiff was employed by an agent of defendant to assist in finding suitable property.

9. ———: Finding Building Site: When Broker Entitled to Commission and When Not. Where a real estate broker, who is employed to procure a building site, directs the attention of the purchaser to a site, which he subsequently purchases at a price less than that stated by the broker, and the negotiations resulting in the purchase are brought about by the broker's disclosure of the property, he is entitled to his commission, although the purchaser himself attends to the matter by consummating the purchase; but if the property, as disclosed by the broker, is not satisfactory to the purchaser, and the broker's disclosure does not result in negotiations leading to the purchase, or if the negotiations, begun as the result of the broker's disclosure, are abandoned and the ultimate purchase is due to the presentation of the property by another at a satisfactory price, the broker is not entitled to recover commission.

10. ———: ———: ———: Jury Question. In an action by a real estate broker for commission in finding a suitable building site, the question whether the purchase and negotiations leading thereto were due to the disclosure of the property by the agent *held*, under the evidence, for the jury.

Appeal from St. Louis City Circuit Court.—*Hon. J. Hugo Grimm*, Judge.

REVERSED AND REMANDED.

*Wm. B. Scullin* for appellants.

(1) Whether or not Rohan was authorized to hire plaintiffs, either expressly, or as a necessary incident,

to carry out and accomplish the purposes of the committee of which he was the chairman, was, under the evidence, for the jury. Gunning Adv. Co. v. Wanamaker & Brown, 115 Mo. App. 270; Nicholson v. Golden, 27 Neb. 132; Brooks v. Jameson, 50 Mo. 505; Sigerson v. Pomeroy, 13 Mo. 620; Howe v. Machine Co., 32 Iowa 435. (2) Defendant had knowledge of the act of Rohan, from which the employment of plaintiffs arose, both before and after the service was completed, and not having denied the authority of this agent, and having accepted all the benefits of his so-called unauthorized acts, have ratified same, and made them their own, and are estopped to deny Rohan's authority. Gunning Adv. Co. v. Wanamaker & Brown, 115 Mo. App. 279; McLachlin v. Barker, 64 Mo. App. 511; Peck v. Ritchey, 66 Mo. 114; Teasdale v. McPike, 25 Mo. App. 341. (3) Defendant having ratified the so-called unauthorized act of Rohan, such ratification relates back to the unauthorized act and is equivalent to previous authority; therefore plaintiffs were regularly employed as defendant's agent. Smith v. Bank, 120 Mo. App. 550.

*John S. Leahy* for respondent.

(1) The persons dealing with a special committee of a board of directors of a corporation, must take notice of the powers of the committee. 2 Thompson on Corporations (2 Ed.), p. 157, par. 1209; Wood & C. Co. v. Portland Cement Co., 190 N. Y. 1; Kelsey v. Railroad, 60 N. J. Eq. 230. (2) Committees appointed to merely examine and make report to the board of directors of a corporation upon any proposition, are not executive committees, and their report is merely advisory, and is not binding unless approved by the board of directors. 2 Thompson on Corporations (2 Ed.), p. 155, par. 1207; Tracy v. Guthrie County Agr. Society, 47 Iowa 27. (3) A broker is never entitled to commissions for unsuccessful efforts. Sibbold v. Bethlehem

Co., 83 N. Y. 378; Morton v. Barry, 140 Ill. App. 333; Whitecotton v. Bacon, 170 Mass. 479; Gamble v. Grether, 108 Mo. App. 340.

STATEMENT.—Plaintiffs, who are partners engaged in the real estate business in the city of St. Louis, sue defendant, a real estate holding corporation, for $950, the alleged reasonable value of their services, rendered at the special instance and request of defendant, in discovering, procuring and submitting for defendant's approval, a suitable real estate site, which the defendant approved and purchased for $38,000.

The answer was a general denial. The trial being before a jury, the trial court directed a verdict for defendant at the close of plaintiffs' evidence, in consequence of which the plaintiffs took a non-suit with leave to move to set it aside, and afterwards, having so moved, and the court having overruled their motion, the plaintiffs have appealed to this court. The evidence disclosed the following:

Defendant, being desirous of purchasing a building site, its board of directors appointed a "real estate committee" and made James M. Rohan chairman of it, with instructions, according to his testimony, "to go out and find an available site" . . . "to go out and ascertain different locations and submit them to the board." Rohan testified that thereupon he saw a great many real estate men and solicited and received offerings from them, which he submitted to the board. Plaintiffs did not know of these promiscuous dealings. A few days prior to March 27, 1907, plaintiff, Thomas W. Murphy, received a telephone message from Ferdinand Meyer, one of defendant's directors, asking Murphy to give him a description and price on the northwest corner of Grand and Laclede avenues. About a year before this, the plaintiffs, without any employment thereto, had submitted some sites for the consideration of the defendant. Murphy got the description and price

asked for by Meyer from the agent for the owner of the property and sent them to Meyer by letter. Meyer turned the letter over to Rohan, and on March 27, 1907, Rohan called with it at plaintiffs' business office. Rohan testified, "I went up to inform him that I was chairman of the real estate committee and that if he had any further communications to present them to me. And we talked about different sites and I told him that we would want a site, and about the neighborhood," etc. Murphy testified, "when Mr. Rohan came to the office he told me he was chairman of the comittee on sites of the Knights of Columbus Building Company. He said that several sites were submitted on Grand avenue." He said, "See what you can get west of Grand avenue." Murphy then suggested, "Why don't you buy a building that you could use for temporary use at the time being?" And Rohan answered, "Why, see what you can get. I want to have something to submit at the next meeting." The plaintiffs' bookkeeper called Murphy's attention to the Mahler Hall property at 3545 Olive street, and he being acquainted with the owner, made an appointment for Murphy to look through the building. Murphy went to the building, met the owner and examined the building. He then wrote a letter on plaintiffs' firm letterhead, to Mr. Rohan, as follows:

"St. Louis, Mo., March 29th, 1907.
"Mr. James M. Rohan,

Dear Sir: Since our verbal conversation I have looked up some sites for the 'Knights of Columbus' home; considering the financial condition, one of these propositions is very desirable for at least a temporary home.

"The property I am going to refer to will, in my judgment, greatly increase in value and could be used for meetings, without the expenditure of much money.

"The following is a description of the property:

*Mahler's Hall,* 3545 Olive Street.

Three-story brick building containing all conveniences for lodge purposes; two halls.

First floor: Reception hall, smoking room, dining-hall and kitchen.

Second floor: Main hall 40x75 with balcony around three sides of hall; ladies' cloakroom with toilet; gents' coat-room with toilet; office.

Third floor: Six living rooms and bath. This may at a very small expense be changed into a small hall.

The building is heated by "Home Comfort" hot air furnace; also is equipped with fire escapes.

Lot 50x147. Price, excluding elec. fixtures, draperies and furnishings, $40,000. (The letter then describes three other locations.) "If the board should desire to take up any of these propositions, we would be very glad to hear from them. I beg to remain,

Yours very truly,

(Signed)                                THOMAS W. MURPHY."

He delivered this letter to Mr. Rohan in person on the day of its date, giving him also a photograph of the Mahler's Hall Building. This was the first time the Mahler's Hall property had been called to the attention of the defendant. When handed the letter and photograph, Rohan said, "this appeals to me." . . . "I will submit this at the next meeting,—bring it up at the board meeting." Rohan testified that he did submit and read Murphy's letter to the board of directors of the defendant at its next meeting and that the board rejected the properties described therein. Murphy called again and Rohan told him that the board did not think favorably of it but that he would bring it up again. Rohan then discussed the matter with different members of the board, and upon Murphy calling again told him that he could not get them interested. Murphy then suggested the advisability of Rohan getting the board to go out and see the property and Rohan

said he would try to do so. . Sometime afterwards the
board did go out in a body to see the property and au-
thorized the purchase of it.  Rohan brought one Levy,
the agent of the owner, to the defendant's president
and they closed the deal and the defendant acquired the
property at $38,000.  Mr. Rohan testified, however, that
it was not on plaintiffs' invitation they had gone out;
that they went out subsequent to that.  That he and
Murphy had "kind of dropped the matter for a while,"
and Murphy had submitted other sites.  That a Mr.
McDonald had again submitted the same property and
the board had then purchased it.  After Murphy heard
the building was sold he called on Rohan and asked
him if they had purchased Mahler's Hall.  Rohan said
"yes."  Murphy said, "How about our commission in
that matter?" Rohn said, "Why I thought McDonald
brought that in." Murphy said, "You are mistaken
about it."  Murphy called Rohan's attention to some
of the things that had occurred when he submitted the
property.  That was on Saturday.  Rohan remarked,
"I don't care who gets the commission."  Murphy said,
"Think it over, Mr. Rohan, and you will remember all
about it."  Murphy called Monday morning and Rohan
said, "It has all come back to me.  You are the one
that submitted it."  Murphy said, "Will you notify Mr.
Leahy to that effect?"  And he said he would.  On August
21, 1907, Murphy wrote to the president of defendant
company expressing his surprise at the information that
his claim for commission had been acted on and ignored
at the last meeting of the board.  He said that he had
given the matter his personal attention and was satis-
fied that if the board was familiar with plaintiffs' con-
nection with the deal they would think differently.  He
asked for an opportunity to establish their claim.  On
September 3, 1907, the ' president answered that he
would present the letter to the board and advise of their
action.  On September 7, 1907, the defendant's secre-
tary wrote that Murphy's letter to the president had

been read to the board and the board had instructed
that Murphy be notified that he would have the privi-
lege of appearing before the board at its next meeting.
On October 5, 1907, the defendant's secretary wrote to
Murphy advising him of the time and place of the next
board meeting and stating, "If you care to come up
they will take up the matter we had under discussion,
concerning the purchase of property at 3845 Olive st."
In response to this letter Murphy appeared before the
board and testified to what transpired as follows:

"Q. Now, what transpired in that meeting of the
board of directors? A. I merely stated my case, or at
least what I had done in connection with this matter,
before the board. Mr. Rohan was not present, and after
I got through stating my case I suggested that they
would not take any action until Mr. Rohan would be
present.

"Q. What, if anything, was said to you by any
member of the board, or any one on behalf of them, con-
cerning the authority or lack of authority of Mr. Ro-
han?  . . .  A. I started to tell what I had done in
connection with the matter, but Mr. Leahy commenced
interrogating me as to the legal features of it. He said,
'You had no written authority from the owner to sell
that property?' I said: 'I did not try to sell the prop-
erty; I was not representing the seller; I was supposed
to represent the purchaser.'

"Q. What, if anything, Mr. Murphy, was said with
respect to the authority or lack of authority of Mr. Ro-
han to employ Murphy & Scullin?"

"The Court: Let the witness state all that was said
there."  . . . .

"A. I had that letter read that I had given to Mr.
Rohan describing the property, and a letter from Mr.
Levy.

"Q. That letter was read before the board? A.
That letter was read before the board of directors. I
don't remember if any other letter was read. I think

not. And after discussing the case, the board of direct-ors, with the exception of Mr. Leahy, I didn't take any active part in it, with the exception of Mr. Kehoe, Mr. Christopher Kehoe. After Mr. Levy's letter was read, Mr. Kehoe said: 'It seems to me it is simply a question of veracity between Mr. Levy and Mr. Leahy.'

"The Court: Between who? A. Between Mr. Levy and Mr. Leahy. I don't think any other member of the board of directors asked any questions. Mr. Leahy did the questioning while I was stating my case.

"Q. That was all that transpired at that meet-ing? A. Yes, sir. There might be some general con-versation, you know, but as I said before that letter was read when the property was submitted, and I stated what I had done, to the board of directors.

"Q. What, if anything, was said on the question of Mr. Rohan's authority to hire Murphy & Scullin? A. There was absolutely nothing said."

In July, 1908, plaintiffs' attorney wrote to defend-ant's president asserting plaintiffs' claim, to which the president answered that if they thought they had a claim they might present it as soon as they desired to collect same. In none of the letters did defendant or any one on its behalf suggest that Rohan had no authority to employ plaintiffs.

Plaintiffs introduced the testimony of several ex-perts, real estate agents, to the effect that the ordinary and customary commission paid to a real estate agent as compensation for his services in discovering and sub-mitting a site which is subsequently purchased by his employer is two and one-half per cent of the purchase price, and that that is the reasonable value of such service.

CAULFIELD, J. (after stating the facts).—I. To sustain the action of the trial court in directing a ver-dict for defendant, defendant asserts that Rohan had

155 App.—42.

no authority to bind the defendant. Respondent raises no question as to whether Rohan, as chairman, had all the authority of the real estate committe and we will deal with the case as if he had. Whether he had authority to employ the plaintiffs must depend upon whether his act in doing so fell within the scope of his authority as chairman of the real estate committee. There is no pretense that he had authority in any other capacity. The express authority and direction he received were to "go out and find an available site;" "go out and ascertain different locations and submit them to the board." Very evidently this was not an express authority to hire a real estate agent to assist him. But it is not necessary that every authority be expressed; Rohan may have had authority to hire plaintiffs because to do so was necessary in order to achieve the main object of his agency, to "find an available site," such hiring not having been forbidden. "It is a fundamental principle in the law of agency that every delegation of power carriers with it the power to do all those things which are reasonably necessary and proper to carry into effect the main power conferred, and which are not forbidden." [Mechem, Law of Agency, sec. 280.] To be necessary, in this sense, the act need not be so indispensable that without it the agent can not move toward achieving the main object of the agency, or having commenced to move, must stop; but it must have been requisite for such achievement, according to the desire and intention of the principal—necessary in the sense that the main scope and object of the agency must fail unless it is done. Whether it was necessary in that sense is a question to be submitted to the jury under proper instructions, where the conclusion to be drawn from the facts and circumstances is not obvious. [St. Louis Gunning Adv. Co. v. Wanamaker & Brown, 115 Mo. App. 270, 295, 90 S. W. 737.]

Applying this method of seeking after authority to the case at bar, the question of Rohan's authority on

the ground of necessity should have been submitted to the jury. The finding of an available building site of large value in a great city might be carried on without employing expert or other assistance, but such assistance is often availed of, and undoubtedly may be of great value. Indeed the circumstances of this case tend to indicate a necessity for it. Rohan had evidently been seeking a long time without result before he called upon the plaintiffs, and within a few days after he called upon them, they directed his attention for the first time to the site which ultimately met the approval of his board.

So far, we have stated merely the legal presumption that a principal intends to vest an agent with power to do all incidental things necessary to the discharge of the agency. But, regardless of this presumption and regardless of the question of ratification, there was sufficient evidence to entitle plaintiffs to go to the jury upon the question of whether there was any actual intent to vest Rohan with the authority to hire plaintiffs. Rohan testified, presumably, to the *language* used in appointing him as evidence of his authority. But language is only one method of expressing intent; conduct is sometimes as significant as spoken or written words. The evidence shows that plaintiffs' letter which first called attention to the Mahler Hall property was read to the board at its regular meeting. Afterwards the board purchased that property. Thereafter, Murphy, one of the plaintiffs, exchanged letters with the officers of the defendant and appeared by previous arrangement before the full board in regular session, urging plaintiffs' claim for compensation. At this board meeting the plaintiffs' connection and claim seem to have been fully discussed. The whole matter hung fire for almost a year before suit was brought. But never in any of these letters or at the board meeting, which Murphy attended, was it suggested that Rohan lacked authority to employ the plaintiffs. That thought did

not seem to occur to defendant's directors or officers. Standing unexplained, this failure for a long time and upon different occasions, to deny Rohan's authority was significant evidence of defendant's intent to vest him with it, and was at least sufficient to entitle plain-. tiffs to have the extent of Rohan's authority submitted as a question of fact to the jury.

II.   Defendant next contends that there was no evidence that Rohan employed the plaintiffs.  We were at first inclined to sustain this contention, but have concluded that there is sufficient evidence tending to sustain plaintiffs' theory to justify submitting the matter to the jury.  Real estate agents are not confined to the business of finding purchasers for owners; they may be engaged as agents to find suitable property for those who wish to purchase, in which case, if there be no stipulation to the contrary, the presumption is they are to be compensated by the purchaser. According to the evidence, Rohan called and asked Murphy, one of the plaintiff firm, to go out and find a suitable site for defendant's need, which Murphy did.  And when Murphy called to see Rohan about plaintiffs' compensation, after defendant had acquired the property, Rohan did not suggest that plaintiffs had not been employed by him, but at first suggested that McDonald and not Murphy had brought the property to his attention and later conceded that Murphy was the first one to find the property.  This evidence tended to prove that Rohan employed the plaintiffs.

III.   Defendant next suggests as a ground for sustaining the action of the trial court, that the property was ultimately purchased at a price less than that at which it was presented by the plaintiffs, and through a different agent.  In this connection the plaintiffs were not employed to find specific property or property purchasable at a fixed price, but we conclude that they were to find, and direct the attention of the defendant to,

property which its board would approve as to price and otherwise. There was substantial evidence tending to show that plaintiffs met the terms of this employment. It is true that the property was acquired at a lower price than that at which plaintiffs called it to defendant's attention, but that would not necessarily defeat plaintiffs' recovery. It was not necessary that in the first instance the bargain presented should be satisfactory, if subsequently it was made so through negotiations brought about by plaintiffs' disclosure of the property. Of course, the price was material. Plaintiffs would not meet the terms of their employment if they presented property satisfactory in every respect except as to price, unless the price was subsequently made satisfactory in negotiations due to plaintiffs' disclosure. And in this respect we deem it immaterial that the defendant itself attended to the matter of concluding the bargain, if the consummation was due to the plaintiffs' disclosure of the property. But if the property, as disclosed by plaintiffs, was not satisfactory to defendant's board on account of price or otherwise and the disclosure did not result in negotiations which led to the purchase, or if negotiations, begun as a result of plaintiffs' disclosure, were abandoned, and the ultimate purchase was due to its presentation by another at a satisfactory price, then plaintiffs cannot recover.

We believe that the evidence in this case was such that the question of whether or not the purchase, or the negotiations which led thereto, were due to the disclosure of the property by plaintiffs, which includes the questions whether or not there was the abandonment we have mentioned, and whether or not the purchase was due to its presentation by another, should have been submitted to the jury, along with other matters as indicated in this opinion.

The judgment will be reversed and the cause remanded. *Reynolds, P. J.,* and *Nortoni, J.,* concur.