A. T. EARLS AND C. E. GOLLADAY, D/B/A EARLS AND GOLLADAY, A CO-PARTNERSHIP, APPELLANTS, v. RUFUS ALSUP, RESPONDENT.— 176 S. W. (2d) 830.

Springfield Court of Appeals, January 6, 1944.

820

*R. Kip Briney* and *R. F. Baynes* for appellants.

*W. P. Wilkerson* for respondent.

FULBRIGHT, J.—This is a suit for a commission for the sale of land. The petition stated in substance that defendant employed plaintiffs to find and produce a purchaser for his farm for a consideration of $11,000 net to the defendant, plaintiffs to receive as commission all above that amount for their services. The answer admits that the farm was sold for $12,000 to A. Guiling, but denies that defendant employed plaintiffs to sell the same and denies that they made the sale. There was a trial by jury and a verdict and judgment for plaintiffs in the amount of $250, from which judgment plaintiffs duly appeal.

The evidence discloses the following facts: Mr. Golladay, one of the plaintiffs, called Mr. Alsup, the defendant, by telephone and asked him to meet him at Puxico. Mr. Golladay testified: "He met me there, the date was March 2, 1942, and in our conversation Mr. Alsup said he would like to sell his farm for $100 an acre or $11,000 net to him and he said 'you can get your commission above that amount, but I must have $11,000 net.' And he gave me the crop acreage and taxes and anything I needed to show in connection with making a sale. He said, 'Go ahead and sell the land . . . ;' that he would like to sell it and use the money." Mr. Golladay made a memorandum in a book of the information given by Mr. Alsup. He

stated: "I entered them and he sat there and watched me." The memorandum follows:

"Rufus Alsup:

        110 acres—

        Loan $4,700.00—Ohio National Life Insurance Company.

        $11,000.00—Net.

        January 1, 1943.

        Taxes—$100.00.

        Earnest Money—$1,000.00.

        Balance Dec. 1st 7 Dec. 15.

        Corn 30 Acres.

        Cotton 7 Acres.

        Wheat 15 Acres.

        Balance General Crops.

        Gov't. Pay—$300.00."

"We had to get our commission above this price of $11,000 and I told him I would price it at $12,000. . . . He said he wouldn't accept less than $1,000 for the contract and the deal be closed around the first of the year or December 1 or 15th."

Mr. Golladay stated that he saw Mr. Guiling the next day and told him he had the Alsup Farm for sale; that the farm would go well with his. He informed him as to the price, amount of the loan, the crop allotment; and he (Guiling) stated that it was a little high but in the future he might let him know more about it; that he had just bought land at the time and wasn't interested just then.

Mr. Gollaway later met Mr. Alsup in Sikeston and after talking with him saw Mr. Guiling and offered the farm for $11,500 to try and get the deal through. Mr. Guiling refused to buy at the time and Mr. Golladay returned and gave this information to Mr. Alsup, and told him, "Leave the price at $12,000 and I will show it to enough men to sell it for $12,000 and he said 'Alright'."

Four or five weeks later Mr. Golladay heard that Mr. Guiling had bought the farm and when he next saw him asked him about it. Guiling stated: "I have already bought it. . . . I gave $12,000. . . . I bought it and signed a contract but we haven't closed the deal but we put up the earnest money."

On cross-examination Mr. Golladay testified that at the time the contract was entered into at Puxico with the defendant he mentioned Guiling and Welter and a number of others as prospects; that he talked to Mr. Welter about the farm as well as several others; that it was not confined to Mr. Welter; that Mr. Alsup "wanted to sell the farm to any one he could sell it to. We mentioned Mr. Welter and Mr. Guiling, but Mr. Guiling was the first man. . . . Mr. Guiling showed quite a bit of interest but he wanted to see his crop further along before he took on the obligation. I told him about the farm being by his land and how it adjoined it and he first said, 'what do they want for it?' And I said $12,000, and he said 'How much is the

loan', and I told him and he wanted to know about crop allotment and taxes and he said, 'Where is the man that owns it?' And I gave him his name and address at Puxico and he said, 'It seems high. . . . I am not interested now but I might be when the crops get further along.' ''

A. T. Earls, a partner of Golladay and one of the plaintiffs stated that he ''talked to Mr. Guiling about the farm and insisted he buy it. . . . I quoted him the price . . . but he told me that he had been talking to Mr. Golladay about the deal.''

Mr. Alsup, the defendant, testified that he talked to Mr. Golladay about selling his farm in the Spring of 1942; that Golladay called him up by telephone and he met him in Puxico. Golladay wanted to know if he would sell his farm. Alsup stated: ''I told Mr. Golladay that I couldn't tell him that he could sell the place and he says he merely wanted to see what he could do, that he thought this man would buy the place, this man Ben Welter in the barber shop and there was not any other man brought into the picture at that time. Mr. Golladay listed the farm there.. . . . I told him . . . if he wanted to see what he could do he could come back after he found a buyer and see me and wife both. . . . No name spoken but the name of Ben Welter. . . . I next saw Mr. Golladay on the street in Sikeston. . . . Q. When you saw Mr. Golladay on the street did you have any conversation with him relative to the matter of selling your farm? A. Yes, sir. . Mr. Golladay then brought in Mr. Guiling at that time, the first time he said anything about Mr. Guiling. He said he wanted to see Mr. Guiling and that he believed Mr. Guiling might buy it and I told him that we didn't know whether he wanted to sell it or not, but land was advancing and we had plenty of time to sell it and get our price and I didn't see any hurry about selling it at that time. . . . I never talked to him again about selling the farm until I came back and I met him at the mail box on the Rock Road. I couldn't just exactly recall when it was but after I had sold it to Mr. Guiling. . . . I did not go to see Mr. Guiling to see if he would buy my farm. He came to my house, him and his son-in-law; that was where the selling of the farm to Mr. Guiling was effected.'' On being asked if he told Mr. Guiling that ''if he would wait awhile the contract with Mr. Golladay would be out and you would sell it to him,'' he replied: ''No, sir. I never had a conversation with him at all.'' He later said that he had discussed the matter of selling the farm with Mr. Guiling before he talked to Mr. Golladay the first time.

On cross-examination he stated: ''I told him (Golladay) at that time (March 2, 1942) if the place was sold I would give possession January 1, 1943.'' He could not recall whether he told Golladay that he wanted $1000 as earnest money or not; nor could he recall that he told him that he wanted the balance payable on the first December or the 15th of December following. On being asked if he gave Golladay the information contained in the memorandum in the

little book, he replied: "Yes, sir. Sitting there on the street of Puxico in my truck. . . . He was to sell it to Ben Welter and was to come back and see me and my wife for sure. . . . Q. Would it have made any difference to you whether he sold it to Ben Welter or someone else? A. Not that I know of, . . . but he was to come back and see me and my wife about it. . . . "

Mr. Guiling testifying on the part of defendant said: "Mr. Golladay did come down there trying to sell me the land and I did talk to Mr. Earls and I don't know that I did tell him or didn't tell him that I would or wouldn't buy it, but we did talk about it. But when I took a notion to buy the land I told my son-in-law to see Mr. Alsup and see if he really wanted to sell it and if he would sell it so I could buy it I might buy it; and a few days later my son-in-law took me there and I bought the land direct from Mr. Alsup and his wife."

The evidence further shows that the contract for the purchase of the land was executed on the 17th day of July, 1942, and the deed made on the — day of November, 1942.

Plaintiffs' sole assignment of error follows:

"The amount of damages assessed by the jury in its verdict, is inadequate and insufficient in amount under the pleadings and the evidence, and should have been for the sum of $1,000 since the jury found the issues in plaintiffs' favor."

Notwithstanding the fact that defendant filed no cross-appeal we have reviewed the whole case as we think it is our duty to do. [Turner v. Anderson, 236 Mo. 523, l. c. 542, 139 S. W. 180; State ex rel. v. Robertson, 187 S. W. 34.]

We have set out substantially all the material evidence and from a review thereof we find there was ample substantial evidence to sustain the allegations in the petition that defendant employed plaintiffs to secure a buyer for his farm at $11,000 net to him; and that he would pay plaintiffs, for their services, all sums of money over and above the sum of $11,000 net, which defendant might receive as a purchase price for the real estate described in the petition. There was also substantial evidence to show that plaintiffs did find a purchaser and that it was through their efforts that the sale was effected; and the fact that Guiling, the purchaser, after being contacted by plaintiffs and given the name and address of the defendant, closed the deal with the defendant in the absence of and without the knowledge of the plaintiffs, is immaterial. [Bell v. Kaiser, 50 Mo. 150; Lombard v. Sills, 170 Mo. App. 555, 157 S. W. 93; Cole v. Crump, 174 Mo. App. 215, 156 S. W. 769; Ross v. Major, 178 Mo. App. 431, 163 S. W. 880; Glassman v. Fainberg, 35 S. W. (2d) 950.]

The fact that plaintiff Golladay was the first one to call Guiling's attention to the land, described it to him and tried to persuade him to buy it and that the latter, shortly thereafter, went to defendant and bought the land through him, was sufficient to authorize the

jury to infer that plaintiffs were the procuring cause of the sale; and the fact that defendant testified that he talked to the purchaser about the land before he, the defendant, talked to Golladay, did not preclude a recovery as a matter of law, since the credibility of the defendant as a witness was a question for the jury. [Coffman v. Realty Co., 176 Mo. App. 692, 159 S. W. 842.]

It was admitted in the answer that the land sold for $12,000 and under the terms of plaintiffs' contract with defendant they were entitled to all sums over and above $11,000 net. A verdict was rendered in plaintiffs' favor for $250. Since the jury found that they were entitled to a recovery the verdict should have been for the full amount provided for in said contract.

It is our view from all the facts and circumstances that there is no necessity for a new trial, but rather that the cause be remanded with directions to the trial court to enter the judgment that should have been originally entered. [Knisely v. Leathe, 178 S. W. 453; Noell v. Ry. Co., 21 S. W. (2d) 937, 1. c. 943; Millinery Co. v. Zirnheld, 75 S. W. (2d) 608, 1. c. 609; Moss Tie Co. v. Stamp, 25 S. W. (2d) 138, 1. c. 141-142.]

The judgment of the circuit court is accordingly reversed and the cause remanded with directions that the judgment of $250 be set aside and judgment entered for plaintiffs as prayed in their petition. *Blair, P. J.,* and *Smith, J.,* concur.