**REALTY INVESTMENT COMPANY, Inc., a corporation, Appellant,**

v.

**ARMCO STEEL CORPORATION, a corporation, Appellee.**

**No. 15885.**

United States Court of Appeals Eighth Circuit.

May 21, 1958.

**324**

David Skeer, Kansas City, Mo., for appellant.

Richard S. Righter and Joseph E. Stevens, Jr., Kansas City, Mo. (Lathrop, Righter, Blackwell, Gordon & Parker, Kansas City, Mo., were with them on the brief), for appellee.

Before SANBORN, WOODROUGH and VOGEL, Circuit Judges.

VOGEL, Circuit Judge.

Appellant, a Missouri corporation, brought this suit against the appellee, an Ohio corporation, for a real estate broker's commission, appellant claiming that appellee employed it in the matter of procuring for appellee certain property owned by the Ford Motor Company.

Suit was commenced in Missouri state court but removed to the federal court on the ground of diversity of citizenship and involvement of more than the statutory amount.

Prior to trial, appellee moved for summary judgment, basing such motion upon admitted exhibits, depositions and affidavits hereinafter referred to. Appellee contended in the motion that the pleadings, exhibits, etc., established (1) that "plaintiff was not the procuring cause of the purchase of the Ford Assembly Plant by defendant"; (2) "plaintiff was not employed by defendant to procure the purchase of the Ford Assembly Plant for defendant"; and (3) "plaintiff attempted to act on behalf of both buyer and seller without full disclosure to both parties". The trial court, in a memorandum and order sustaining appellee's motion for summary judgment, determined under item 2 that the plaintiff was not employed by defendant to procure the property, that "the undisputed facts before the court, as revealed by the deposition of Jack Seligson, plaintiff's agent, and the exhibits identified by him and attached to his deposition, is dispositive of the issue of employment, which after all, is the first question to be determined." The trial court then found:

"From a careful study of Seligson's testimony and the written communications attached to the deposition, I am unable to find anything that would suggest any contract of employment, expressed or implied.

"It Is Therefore, my conclusion that there is no genuine issue of any material fact, and that the Motion for Summary Judgment should be, and is hereby sustained."

 Under the provisions of Rule 56 (c), Fed. Rules Civ. Proc., 28 U.S.C.A., summary judgment " * * * shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In interpreting that rule, this

court, in Northwestern Auto Parts Co. v. Chicago, B. & Q. R. Co., 8 Cir., 1957, 240 F.2d 743, 746, certiorari denied 355 U.S. 815, 78 S.Ct. 16, 17, 2 L.Ed.2d 32, said:

"* * * a summary judgment upon motion therefor by a defendant should never be entered except where the defendant is entitled to its allowance beyond all doubt; only where the conceded facts show defendant's right with such clarity as to leave no room for controversy; with all reasonable doubts touching the existence of a genuine issue as to a material fact resolved against the movant; giving the benefit of all reasonable inferences that may reasonably be drawn from the evidence to the party moved against. 'That one reasonably may surmise that the plaintiff is unlikely to prevail upon a trial, is not a sufficient basis for refusing him his day in court with respect to issues which are not shown to be sham, frivolous, or so unsubstantial that it would obviously be futile to try them.' Sprague v. Vogt, 8 Cir., 150 F.2d 795, 801; Traylor v. Black, Sivalls & Bryson, Inc., 8 Cir., 189 F.2d 213; Union Transfer Co. v. Riss & Co., 8 Cir., 218 F.2d 553; Caylor v. Virden, 8 Cir., 217 F.2d 739."

See also, Severson v. Fleck, 8 Cir., 1958, 251 F.2d 920.

With such interpretation in mind, we examine the record as it appeared before the trial court when summary judgment was granted. Appellant is a corporation engaged in the business of buying and selling real estate for others as a licensed real estate broker. Jack Seligson was employed by the appellant corporation as a real estate salesman. Insofar as matters with which this case is concerned, the appellant acted only through Seligson. Prior to April, 1956, Seligson made various calls to the Ford Motor Company Assembly Plant in Kansas City to determine whether Ford had as yet put the plant property on the market for sale. His inquiries in this regard began the latter part of 1954 and extended through April, 1956, at which time he learned a decision had been reached to sell the Kansas City property and he was informed that he should contact a Mr. Powell at Ford's Dearborn, Michigan, office. Seligson thereupon approached several organizations whom he thought might be interested in purchase of the Ford property including Gershon Properties, Columbia Doll Company, and Sonken-Galamba. In late April, 1956, Seligson called the Kansas City office of the appellee and was referred to R. F. Kuhnlein, at that time superintendent of construction, assistant division manager and special assistant to the president of said division. Kuhnlein told Seligson that four years prior thereto they had attempted to negotiate for the Ford plant but that it was not available for purchase and he, Kuhnlein, did not think it ever would be. Seligson told Kuhnlein that he had reason to believe it was available. Kuhnlein then said, "Okay, we want it if it is available." He told Seligson to "go along with this", also to "get all information on the project", and asked for a "break-down" by which was meant price, terms, time of possession, etc. Thereupon Seligson wrote his letter of May 17, 1956, to Mr. Powell of Ford's Dearborn office, as follows:

"Dear Sir:
"I was referred to your office by Mr. Rayburn and Mr. McManus of your Kansas City, Missouri Assembly Plant, at 12th and Winchester. This is in regards to the eventual disposition of plant buildings and land now maintained at the above mentioned location by the Ford Motor Company.

"We have been authorized by three large manufacturing corporations to negotiate for either lease or outright purchase of part or all of the present installation and land.

"I would very much appreciate a briefing from you in regards to this property and also other essential information that we will need, includ-

ing maps so that we may proceed on a speedy scale.

"It is my firm belief that we can get a satisfactory transaction negotiated and completed within a minimum element of time.

"It will be gratifying to hear from you by return mail."

On June 5, 1956, the Ford Motor Company property management department replied to Seligson's letter, stating in substance that they were in the preliminary stages preparatory to forming an opinion of market value prior to placing the property up for sale, that they believed they would be in a position to discuss sale in about 60 days, and suggested Seligson contact them at such time, and that they would then " * * * give you enough information so you can present the property to your purchaser". Seligson thereupon called Kuhnlein on the telephone, who still expressed disbelief that the property was for sale and asked to see the letter from the Ford Motor Company. He stated that his company "was interested and wanted the property, that some other real estate companies also had the property for sale". Seligson told Kuhnlein that irrespective of that, Seligson had aroused appellee's interest and considered appellee his customer. At the time of this conversation Kuhnlein made an office memo which was later circulated to other Armco officials with a copy of the Ford Motor Company letter referred to by Seligson. The memo stated:

"Jack Seligson of the Realty Investment Company, Emerson 1–3876, called me this morning and asked if we would be interested in buildings and real estate for possible expansion at Kansas City. He was talking about the Ford Motor Company Plant at 12th & Winchester.

"He has received a letter from the Ford Motor Company advising that they are now in the process of preparing fair market values for this property and that this complete information will be available to him within sixty days. The Ford Motor Company, he said, indicated occupancy of this property could be expected no earlier than February 1957. Mr. Seligson has a letter from Ford dated June 5, 1956 setting out this information. I have asked him to put this in a letter and attach a copy of the Ford Motor Company letter. In discussing the apparent lack of interest in the Ford Motor Company in disposing of this property, Mr. Seligson indicated that they had been required by the government to hold the property at 12th & Winchester in standby condition for possible defense use. It was Mr. Seligson's understanding that this stipulation has now been lifted and Ford is free to handle the property as they see fit. If this is true, it could account for the delays and lack of information which we have encountered concerning this property."

Seligson sent Kuhnlein a photostat of the Ford Motor Company letter, accompanied by the following letter dated June 8, 1956:

"Dear Sir:

"Enclosed you will find a photostatic copy of a letter addressed to me from Mr. Roy Anderson with The Ford Motor Company in Dearborn, Michigan. From its contents you will note we are about sixty (60) days premature in being able to discuss facts and figures, however in our telephone conversation you suggested a written preliminary proposal and this letter may be construed as such.

"Discussions between myself and executives of The Ford Motor Company, have been going on for approximately two (2) years. It has been my understanding that due to information received by the Ford Motor Company, from Washington, D. C., this property could not be sold, however these restrictions having now been lifted, the property is being appraised in order to determine a fair market value.

"After surveying the complete area, we find this property most suitable for your operation. We have not submitted this property to any one as we feel that you are the most logical purchasers.

"We are depending upon your good offices to keep this matter VERY CONFIDENTIAL. Your confidence will also enable us to be in a better position to negotiate a mutually satisfactory agreement sixty (60) days hence.

"Although you may think we are 'jumping the gun,' we feel early preliminary negotiations should be entered into because of the importance of subject property."

Subsequent to the foregoing letter of June 8, 1956, Seligson attempted to call Kuhnlein three or four times. His calls were never returned and he was never able to talk to Kuhnlein again nor obtain an appointment with him. On July 3, 1956, Seligson wrote the following letter to Roy Anderson of the Ford Motor Company:

"Dear Mr. Anderson:

"In your letter of June 7th, you stated that a real estate appraisal was under way on the Ford Motor Company Assembly Plant Properties at 12th and Winchester Street, in Kansas City, Missouri.

"Should a market value and overall price be established on subject properties at this time, I feel it would be of prime importance to arrange an immediate appointment with your office at your convenience, as it will be imperative to gather first hand, the essential information, plot plans and all details pertaining to the sale of the Ford properties.

"I am reasonably certain that, sale negotiations could begin immediately with our clients, Sheffield Steel (Armco), Sonken Galamba and Columbia Toys, Incorporated, upon formal presentations of these properties and that actual sales transactions could be consummated within a minimum time element.

"Kindly advise me when it would be most convenient for an appointment with your office."

He received no answer to the foregoing letter and on August 17, 1956, again wrote Anderson as follows:

"Dear Mr. Anderson:

"On July 3, 1956, I wrote you in regard to the appraisals that were under way on the Ford Motor Company's assembly plant properties, at 12th and Winchester Street, Kansas City, Missouri.

"In that letter, I indicated that I had several clients that were qualified and prepared to make offers on part or all of the buildings and vacant land now owned by the Ford Motor Company. Prior to writing the above mentioned letter, executives of the Sheffield Steel Company requested me to gather necessary information regarding the extent of the land and buildings involved. They also desire information as to real estate appraisals of the entire building installations and ground.

"My other clients, as mentioned in my previous letter, are also waiting for this information. Therefore, kindly forward such information to me as soon as possible."

No reply was received to this letter.

The deposition of R. F. Kuhnlein indicates, inter alia, that other agents had called him about the sale of the Ford property but none supplied him with any terms of sale; that in late summer or early fall, 1956, negotiations were opened at Kansas City between Ford and the appellee. Such negotiations were initiated by two men connected with the St. Louis-San Francisco Railway Company, which company had been requested by Ford to suggest names of possible purchasers. The railroad representatives were informed that appellee was interested if it knew the price, acquisition date and terms. Negotiations between the two parties, with Roy I. Anderson, with whom Seligson had had previous correspondence, representing Ford, and Kuhn-

lein, representing appellee, resulted in purchase of the Ford plant by appellee on October 12, 1956.

In this court, appellant raises three points: (1) That appellee employed appellant; (2) that appellant was the procuring cause of appellee's purchase; and (3) appellant represented only one party, appellee.

In connection with the question of employment, it will be noted that Kuhnlein told Seligson in their first conversation that his company wanted the Ford plant if it was available, that he said, "Okay, we want it if it is available," and that he asked Seligson for a "break-down", whereupon Seligson may well have thought that he was employed to obtain information as to price, terms, time of possession, and to negotiate for purchase, as indicated by his letter of June 8, 1956, to Kuhnlein and his conversation with him on the preceding day. See Murphy v. Knights of Columbus Bldg. Co., 1911, 155 Mo.App. 649, 135 S.W. 446, 447; O'Neal v. Mavrakos Candy Co., 1953, Mo. Sup. en banc, 364 Mo. 467, 263 S.W.2d 430, affirming Mo.App., 255 S.W.2d 138. We think on the question of employment the record was not so clear as to justify the harsh remedy of summary judgment and that there did exist a genuine issue of material fact as to whether Kuhnlein, representing the appellee, employed appellant to negotiate for the Ford plant. See Ballentine v. Mercer, 1908, 130 Mo. App. 605, 109 S.W. 1037, 1041.

We next determine whether a genuine question of material fact was presented by appellant's claim that it was the procuring cause of the sale of the Ford plant to appellee. The term "procuring cause" refers to the cause originating a series of events which, without break of continuity, results in the accomplishment of the object of employment of the agent. Rogers v. McCune, Mo.App.1955, 283 S.W.2d 872, 877, and cases there cited. The general rule of Missouri law as to the rights of a real estate broker who claims to have been the procuring cause of a sale of real estate is stated in Barnum v. Hutchens Metal Products, Inc., Mo., 1953, 255 S.W.2d 807, 808:

"It is the general rule that a real-estate broker is entitled to recover his commission on the sale of real estate if he shows himself to have been the procuring cause of the sale although the owner himself had finally consummated the sale. Of course, the rule is equally applicable whether the owner consummates the sale personally or through another broker. The owner cannot escape liability to a broker who is the procuring cause of a sale by employing another broker to consummate the transaction; and whether or not a broker is the *procuring cause* is ordinarily a question for the jury. Bowman v. Rahmoeller, 331 Mo. 868, 55 S.W.2d 453; Bell v. Kaiser, 50 Mo. 150; Studt v. Leiweke, Mo.App., 100 S.W.2d 30; Grether v. Di Franco, Mo.App., 178 S.W.2d 469; Earls v. Alsup, 237 Mo.App. 819, 176 S.W.2d 830."

In examining the facts and circumstances which relate to the question of procuring cause and taking that view thereof most favorable to the appellant, and in giving the appellant the benefit of all reasonable inferences therefrom, we find that the appellee first learned that the Ford plant was going to be for sale through Seligson's telephone call of late April, 1956. In response to Kuhnlein's specific request to Seligson, made at that time, appellee learned later through Seligson's telephone call and letter of June 7th and 8th that Ford was then preparing to offer its Kansas City plant for sale 60 days hence, at which time its fair market value and offering price would be determined. It learned through Seligson something of the terms and that occupancy of the plant could not be had until February, 1957. It learned that the plant had previously been withheld from sale because of recently lifted government defense restrictions. Within approximately 60 days thereafter Anderson of the Ford Motor Company and Kuhnlein of the appellee, to whom Seligson

had furnished the foregoing information, were commencing negotiations with each other. Both Anderson and Kuhnlein knew that Seligson was acting for appellant and that he claimed to represent appellee.

The significance to appellee of Seligson's information, particularly as to Ford's past unwillingness to sell its Kansas City plant, is apparent from Kuhnlein's memo made at the time the information was received. It is not our concern whether this information, together with the copy of the Ford letter sent to appellee by Seligson, set in motion an uninterrupted series of events which proximately led to the sale of the plant to appellee a few months later. We need only determine whether these facts and circumstances afford a reasonable basis for the existence of a controversy as to appellant's claim that it was the procuring cause of the sale. Kuhnlein's failure to answer Seligson's letter and enclosure of June 8th and the fact that he thereafter was unavailable to Seligson may indicate that appellee had abandoned any intention to use the information supplied by Seligson. When considered with subsequent events, however, they could reasonably support an opposite finding. As we have already stated, the probability that the appellant could not in the end recover does not justify the granting of summary judgment against it. In viewing all of the pleadings, depositions, exhibits and affidavits most favorably for appellant, we believe there was a genuine issue of material fact on the question of procuring cause and that appellee was not entitled to summary judgment without trial.

On the third point, appellant claimed, in answer to the charge that it was attempting to represent both buyer and seller without full disclosure to both parties, that it represented only the appellee. Upon a trial of the case, the appellee would have the burden of showing by the preponderance of the evidence that the allegations of this particular defense were true. See Ballentine v. Mercer, 1908, 130 Mo.App. 605, 109 S.W. 1037,

1042. We have examined the record on this point and find it contradictory and inconclusive. The most that can be said for appellee's showing as to dual agency is that it raises a dispute as to a question of fact. Instead of obviating the need of a trial, appellee's claim of attempted dual agency and its proofs thereon tend to support the conclusion that a trial should be had.

By summary judgment, the appellant here has been denied its day in court and the opportunity to establish, if it can, that it had been employed by appellee to arrange for the purchase of the Ford plant and that it was the procuring cause of such purchase by appellee.

Reversed and remanded for trial.