**BLACKBURN–ENS., INC., Doing Business as North County Realty Company, (Plaintiff) Appellant,**

v.

**Raymond ROBERTS and Lillie Roberts, (Defendants) Respondents.**

No. 31565.

St. Louis Court of Appeals.

Missouri.

May 19, 1964.

Motion for Rehearing or to Transfer to Supreme Court Denied June 22, 1964.

Ray Carleno, Carleno & Nick, Ferguson, for appellant.

Alvin H. Juergensmeyer and Darryl L. Hicks, Warrenton, for respondents.

WOLFE, Judge.

This is an action whereby the plaintiff seeks a judgment for a commission alleged to be due under an agency contract with the defendants for the sale of real estate. There was a verdict and judgment for the defendants, and the plaintiff prosecutes this appeal.

The evidence presented reveals the facts to be that the corporate plaintiff was doing business as the North County Realty Company. Its president was a Mr. Blackburn. The defendants owned the house located on Lots 1 and 2 of Honey Locust Acres, in St. Louis County. The house and the lots fronted on Old Florissant Road. The defendants also owned Lot No. 3 in Honey Locust Acres, which was directly to the rear of and adjoining Lots 1 and 2. The defendants were husband and wife, and while the property was in the name of Lillie Roberts, the wife, they considered it as jointly owned. They desired to sell the house and Lots 1 and 2. They wanted a quick sale as they were in arrears in taxes and were unable to meet the mortgage payments.

They planned to sell Lots 1 and 2, upon which the house was built, and retain Lot 3 for the purpose of building another house. Lot 3 had about $600 to $800 worth of cut building stone upon it. This was left over from another house that Roberts had built. In October of 1960, the defendants had their own "For Sale" sign up, and a man named Stanley K. White, seeing the sign, had stopped to look at the house. But the defendants were not there. Mr. White looked in the garage, and in doing so let the defendants' dog out. He telephoned defendant Roberts and apologized for having let the dog out, and told him the purpose of his visit to the house.

On November 11, 1960, the defendants entered into a contract with the North County Realty Company, giving that company the exclusive right, for sixty days, to sell the house and Lots 1 and 2 for $27,500. The contract is printed on a card. On one side of the card is a description of the property to be sold, and on the other side is the agency agreement and the signatures. Lots 1 and 2 are set out in the description. In the top corner, apart from the place for the description of the property, there is written "xtra lot 100 x 200". The defendant Roberts testified that this was not on the card at the time it was signed, and was added without his knowledge.

The plaintiff put up its sign on the property and advertised it. One of the plaintiff's salesmen showed several people through the house, and among them was the Mr. White with whom defendant Roberts had talked by phone some time prior to the date of the listing agreement. The salesman introduced Mr. White to Mr. Roberts. Mr. White had seen the plaintiff's sign on the property and arranged to inspect it. He was not interested in buying, as he thought that the price asked was too high.

No sale was made by the plaintiff, and in the latter half of January, the defendant Roberts took down the plaintiff's For Sale sign and put back his own, which read, "For Sale by Owner." Mr. Blackburn came by

and, according to the plaintiff, they agreed that the listing contract was terminated. He said that he told Blackburn that he would still pay him a commission if Blackburn would sell the property. Blackburn put his company's sign in the back of his car and drove away with it.

Later, and around the first of February, Mr. White was driving by the property and saw defendant Roberts in the yard. Mr. White stopped to talk to Roberts, and asked him if the house was still for sale. Roberts told him at that time that there was a mortgage against the house which he could not meet, that he owed two years' taxes, and that he was willing to sacrifice to make a sale. Roberts told White that he would include the third lot, which originally was not included in the deal, and he agreed to sell the three lots and the house for $27,000, which was $500 less than the amount originally asked for the two lots. The transaction was closed with White, through the Bank of Ferguson, on March 10, 1961, and the Roberts transferred to the Whites Lots 1, 2, and 3 for a total sum of $27,000. From this amount the mortgage and back taxes were paid off, leaving a net total to defendants of $3,032.48.

Mr. Blackburn, the president of the corporate plaintiff, testified that the contract was not terminated at the time of the sale, and that it could only be terminated by sixty days' notice in writing, and, as stated, he claims a commission of 6 percent upon the sale price of $27,000.

■ It is first contended by the appealing plaintiff that the court erred in refusing to direct a verdict for the plaintiff on plaintiff's motion made at the close of its case and at the close of all of the evidence in the whole case. This point is predicated upon two theories. One is that the contract was not terminated because it provided that "agency shall continue for two months from the date hereof, and thereafter until terminated by us upon and after sixty days' notice." The "us" referred to is of course the owners who signed the contract. This is no bar

to the sellers and the agent agreeing to terminate the contract, and that is what happened according to the defendant's testimony. It therefore follows that this clause of the contract afforded no reason for a directed verdict against the defendants.

The second point relied upon is that the contract provided that the agent was to receive a commission if a sale was made within sixty days after the term of the contract to any person procured by any one during the term of the contract. This clause is to protect the agent from a loss of his commission on a sale, if the sale under negotiation could not be terminated within the term of its agency, or if the seller, in order to defraud the agent of his commission, intentionally delays closing a sales agreement until the agency contract expires. It is, however, limited to a purchaser "procured" during the term of the agency. In discussing the meaning of the word "procure", as used in these contracts, our Supreme Court stated in Kyle v. Kansas City Life Ins. Co., 356 Mo. 331, 201 S.W.2d 912, l. c. pp. 913–914:

> "Appellants lay great stress upon the word 'produce' as used in the letter from Thompson to respondent dated October 31, 1944, wherein it was stated the regular commission would be paid 'in case you produce a purchaser.' There is a shade of difference between 'produce' and 'procure,' but under facts similar to those now under consideration, where the sale was actually made, courts have rarely, if ever, recognized that difference. The general rule is that if a broker procure a purchaser who is ready, willing and able to buy on the seller's terms, the broker is entitled to his commission whether or not the sale is consummated. Lane v. Cunningham, 171 Mo.App. 17, 153 S.W. 525. If a sale is not consummated, a broker, in order to earn a commission, must not only 'procure' a purchaser, but he must 'produce' him; that is, he must not only find one, but he must put him in touch with the seller."

■ There was evidence from both the seller and the buyer in the case before us that the buyer was first attracted to the property and caused to look at it, prior to the agency contract, by the seller's own sign. It is also true that the agent's salesman showed White, the buyer, the house while the agency contract was in effect. It is not enough, however, that the agent's act is simply one of a chain of causes producing the sale. Williams v. Mashburn, Mo. App., 37 S.W.2d 478; Mack v. Mohler, Mo. App., 52 S.W.2d 188. It appears that the word "procured" here has more the meaning of "found", and the evidence was sufficient for a jury to conclude that the buyer was in this sense procured, not during the term of the contract, but prior thereto. As to who was the procuring cause is ordinarily a question for the jury, and the court did not err in submitting it to the jury. Barnum v. Hutchens Metal Products, Mo.Sup., 255 S.W.2d 807; Earls v. Alsup, 237 Mo.App. 819, 176 S.W.2d 830; Bowman v. Rahmoeller, 331 Mo. 868, 55 S.W.2d 453.

■ It is contended that the court erred in giving a verdict-directing instruction for the plaintiff, designated as Instruction No. 1. This instruction contained an alteration of an instruction offered by the plaintiff. With certain exceptions, not here present, the scope of our review is limited to the allegations of error contained in the motion for a new trial. Civil Rule 79.03, V.A.M.R.; In re Alexander's Estate, Mo. Sup., 360 S.W.2d 92. The only error here alleged and preserved in the motion for a new trial, which is not covered by that which we have heretofore said, is that the court erred in not defining the word "procured." If an explanation of the word was desired, the plaintiff should have requested an instruction defining or explaining it. In the absence of such a request, the court cannot be charged with error. Thurman v. St. Louis Public Service Company, Mo.Sup., 308 S.W.2d 680, 681, and cases cited therein. This contention must therefore be ruled against the appellant.

The next allegation of error goes to Instruction No. 2, and it is said to be erroneous because there was no evidence that the buyer was procured prior to the listing agreement. That which we have said in relation to the first point raised fully covers this allegation of error, and it, too, must be ruled against the appellant.

Further contention is made that the court erred in refusing the instruction designated as No. 3 A. This instruction directed a verdict for the plaintiff without regard to the time of the procurement, and the court properly rejected it.

■ Two other instructions were offered and refused. It is contended that the court erred in refusing them both. One, designated as No. 4, was not in fact an instruction, but a mere comment on some of the evidence. The other instruction, designated as No. 5, and refused, was in part a repetition of Instruction No. 1 which was given, and the court did not err in refusing both Instructions 4 and 5.

■ The last point raised by the appellant relates to the jury panel. Counsel for the plaintiff, near the conclusion of the voir dire examination of the jurors, made a challenge for cause against some jurors on the panel who had been represented in the past by Mr. Alvin H. Juergensmeyer, who was counsel for the defendants. The examination disclosed that nine of the jurors had at some time employed him either for closing a real estate deal, examining abstracts of title, or filling out income tax returns. They said that they were satisfied with the services they had received, and would employ him again in the event the need arose. They were asked if the fact that they had employed Mr. Juergensmeyer would prevent them from returning a fair and impartial verdict, and to this question their response was negative.

The case was tried in Warren County, which has a population of less than 8,000 people. In a county of that size, it would probably be difficult to find a panel of jurors that did not contain a number of people who at one time or another had used the services of the few lawyers available in the county. The fact that some had at some time employed Mr. Juergensmeyer, in the absence of a showing that their relationship would in fact prejudice them, did not disqualify them as jurors. As early as 1877, in State v. Jones, 64 Mo. 391, the Missouri Supreme Court held that a father-in-law of the prosecutor in a criminal case was not rendered incompetent to serve as a juror by reason of the relationship. The Kansas City Court of Appeals, in Gardner v. Metropolitan Street Railway Co., 177 S.W. 737, reversed a trial court which had sustained a challenge for cause directed at jurors who knew counsel for the defendant. Again, in Plater v. Kansas City, 334 Mo. 842, 68 S.W.2d 800, it was held that the close association between a juror and one of the attorneys was not of itself a disqualification. We find this point also without merit.

The judgment is affirmed.

RUDDY P. J., and ANDERSON, J., concur.

On Motion for Rehearing

PER CURIAM:

■ The appellant filed a motion for rehearing or, in the alternative, to transfer this cause to the Supreme Court. It is pointed out that we did not specifically rule upon appellant's assertion that the court erred in refusing to give an instruction offered by the plaintiff, which is as follows:

"The Court instructs the jury that under the law it is presumed where a real estate broker having an exclusive listing on real estate shows the property to one who later purchases said property, that the broker was the procuring cause, and the burden of proving that said purchaser was not procured by said broker is upon the defendants to show by a preponderance of the evidence."

The court properly refused the instruction as the burden of proof was upon the plaintiff throughout the trial, and for the further reason that it is improper in a civil case to instruct on any presumption where there is evidence on the subject, and such instruction should not be given. Nuckols v. Andrews Investment Company, Mo.App., 364 S.W.2d 128, and cases therein cited.

Otherwise the points raised in the motion are but repetitious of those presented by brief and argument, which were passed upon. We find them also without merit.

The motion for rehearing and the alternative motion for transfer to the Supreme Court are overruled.

RUDDY, P. J., and WOLFE and ANDERSON, JJ., concur.